# WILLIAM B. GORMLEY, M.D., M.P.H., MBA

DIRECTOR
Neurosurgical Critical Care
Department of Neurosurgery
Brigham and Women's Hospital
Boston. Massachusetts



Harvard Medical School
Boston, Massachusetts

R. Craig McLaughlin, Esq.
Elk & Elk Co., Ltd.
6105 Parkland Blvd., Suite 200
Mayfield Heights, OH 44142

June 17, 2021

**Re: Kelsea Mercer, Administrator for the E/O Jennifer Ohlinger v. James Gray II, RN, et al.**

Dear Mr. McLaughlin:

I reviewed the medical records and other documents concerning Jennifer Ohlinger and the incident that took place while she was an inmate at the Southeastern Ohio Regional Jail. I am writing this report to summarize my qualifications as an expert witness; summarize the relevant information contained in the documents I reviewed; and provide you with a summary of my expert opinions concerning this matter.

## MY EXPERT QUALIFICATIONS

I am a physician licensed to practice medicine in Massachusetts. I am board certified in Neurosurgery and in Surgical Critical Care. I am an Associate Professor in Neurosurgery at Harvard Medical School. I also hold the following positions at Brigham and Women's Hospital in Boston, Massachusetts: Director of Neurosurgical Critical Care; Director of Traumatic Brain Injury Clinic; Director of the Neurosurgical Outcomes Center; and Director of Neurosurgery Subspecialty Fellowship in Critical Care. A further summary of my education, training, experience, and credentials is contained in my Curriculum Vitae.

## DOCUMENTS REVIEWED TO DATE

### Medical Records and Other Documents

- Videos from security camera at Southeastern Ohio Regional Jail (SEORJ)
- Incidents reports and statements from SEORJ employees
- Statements from inmates at SEORJ
- Athens County EMS records
- O'Bleness hospital medical records
- MedFlight medical records
- Ohio Health Riverside Methodist hospital medical records



PLAINTIFF'S EXHIBIT A

- CD containing radiology images for Jennifer Ohlinger from Riverside Methodist Hospital

## Deposition Transcripts

- Defendant James Gray, II, RN (Jail nurse)
- Defendant Charity Lowery (Jail correction's officer)
- Defendant Amista Jarvis (Jail correction's officer)
- Exhibits 1-14 from these depositions

## SUMMARY OF THE CASE

Jennifer Ohlinger was an inmate at SEORJ on June 25, 2018. Security camera video depicts Jennifer walking out from her cell and into the common area of the jail. She sits down on a bench and then falls over onto the floor. Other inmates called for help and told Corrections Officer Lowery that Jennifer had hit her head and was having a seizure. Corrections Officers Lowery and Jarvis responded and summoned the jail nurse, James Gray, II. Nurse Gray was informed Jennifer had hit her head and had a seizure. He also admitted Jennifer told him she had passed out. He assessed Jennifer and then had CO Jarvis escort Jennifer back to her bed. SEORJ guidelines state that a doctor should be called or the inmate should be transferred to the Emergency Department (ED) if the inmate experiences a loss of consciousness or a seizure. Despite having the above information, Nurse Gray did not call a medical doctor to discuss Jennifer's medical condition and did not transfer her to the ED. Further, neither Nurse Gray nor the corrections officers notified the warden.

A short time later, inmates called for help again. They told CO Lowery Jennifer had experienced another seizure. CO Lowery and CO Jarvis responded to Jennifer's cell and realized she had urinated on herself. They took Jennifer to Nurse Gray and relayed this information to him. He assessed Jennifer, did a urine dip test, and then had Jennifer escorted back to her bed. Nurse Gray again did not call a medical doctor to discuss Jennifer's medical condition. Again, neither Nurse Gray nor any of the corrections officers notified the warden.

Approximately two hours later, inmates detected Jennifer was not breathing and called for help a third time. Corrections officers arrived at Jennifer's cell and called for Nurse Gray. He started CPR and 911 was called. Jennifer was taken to the local hospital and she was then life flighted to a trauma center in Columbus. A CT scan detected a subarachnoid hemorrhage. Jennifer died the next morning. The coroner ruled the cause of death as seizure activity as a consequence of subarachnoid hemorrhage and subdural hemorrhage.

## SUMMARY OF MY EXPERT OPINIONS

Based upon my review of the medical records, videos, documents, and the deposition transcripts provided to me as well as on my education, training, and many years of experience as a medical doctor who specializes in geriatrics, I have the following

opinions I hold to a reasonable degree of medical certainty ("more likely than not") standard:

1.  In my opinion, more likely than not, Jennifer Ohlinger's medical needs on the morning of June 25, 2018 were serious. Nurse Gray had been informed Jennifer had fallen and hit her head. In addition, he admitted Jennifer told him she had passed out. Finally, he had also been informed Jennifer had suffered seizures and urinated herself. Individually and/or collectively, this information should have alerted him to the fact that Jennifer needed immediate medical evaluation and treatment from a medical doctor at the ED.

2.  In my opinion, more likely than not, Nurse Gray's failure to call a medical doctor to even discuss Jennifer Ohlinger's medical condition and his failure to send her to the ED after being informed she had hit her head; passed out; and suffered seizures is inexcusable and is indicative of being deliberately indifferent to Jennifer's serious medical needs.

3.  In my opinion, more likely than not, the delay in getting Jennifer Ohlinger evaluated and treated by a medical doctor at the hospital proximately caused her injury and her premature death.

4.  In my opinion, had Jennifer been sent to the ED by Nurse Gray and/or SEORJ at 7 a.m. - 7:15 a.m. when the nurse and corrections officers were made aware of her serious medical needs then, more likely than not, Jennifer would not have died. The neurological outcome of a patient is directly related to the condition of the patient when they reach treatment and, in this case, if Ms. Ohlinger had been seen while still awake and alert, her outcome would likely have been one of full recovery. As it happened, the personnel at the correctional facility did not get Ms. Ohlinger to medical care until after she had suffered a cardiac arrest and was otherwise in agonal medical condition, a guarantee of the devastating outcome which she suffered.

I reserve the right to modify and/or supplement my opinions in this case upon the receipt of new information or documents. All opinions are rendered to a reasonable degree of medical certainty. I have no financial stake in the outcome of this case.

Sincerely,

*William B Gormley, MD, MPH, MBA*
60 Fenwood Road,
Building for Transfomational Medicine 4244.
Boston, MA 02115
wgormley@partners.org