## UNITED STATES DISRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**KELSEA MERCER,** *as Administrator*
*of the Estate of Jennifer Ohlinger, deceased,*

    Plaintiff,

    v.

**ATHENS COUNTY, OHIO,** *et al.*,

    Defendants.

Case No.: 2:20-cv-3214
JUDGE EDMUND A. SARGUS, JR.
Chief Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

This matter arises on Defendant James Gray, II, Charity Lowery, Amista Jarvis, Cody Gilbraith, and Joshua VanBibber's Motion for Summary Judgment (ECF No. 39) and Plaintiff Kelsea Mercer's Motion to Drop Defendants Cody Gilbraith and Joshua VanBibber (ECF No. 43.) For the reasons stated herein, both motions are **GRANTED**.

### I.

Shortly before 7 A.M. on June 25, 2018, Jennifer Ohlinger collapsed to the floor of the Southeastern Ohio Regional Jail ("SEORJ") and began to suffer the first of multiple seizures. Over the next hour, three SEORJ officials—Officer Charity Lowery, Officer Amista Jarvis, and Nurse James Gray, II ("Nurse Gray") (collectively, the "SEORJ Defendants")—tended to her as she passed in and out of consciousness. Ultimately, this amounted to placing Ms. Ohlinger back in her cell to await blood testing. All the while, her brain unknowingly hemorrhaged. Shortly after 9 A.M., Ms. Ohlinger was discovered unconscious and without a pulse. Efforts to revive her at several hospitals were unsuccessful, and the next day, she died.

1

Ms. Ohlinger's daughter, Kelsea Mercer, places much of the blame for her mother's death on the SEORJ Defendants, whom she alleges were "deliberately indifferent" to Ms. Ohlinger's clear physical decline. On that basis, Ms. Mercer brings various federal- and state-law claims against them. The SEORJ Defendants, in turn, now move for summary judgment in full. And due to the high legal thresholds of Ms. Mercer's particular claims, they prevail.

A.  June 20–24, 2018

On June 20, 2018, Ms. Ohlinger was booked into the SEORJ on charges of burglary and receiving stolen property. (Def.'s Ex. A., ECF No. 39-1 at PageID #509.) At intake, she reported no physical signs of trauma or illness "requiring immediate emergency treatment," but did indicate she suffered from various mental conditions and used at least one "street drug." (Medical Questionnaire, Pl.'s Ex. 6, ECF No. 36-5.) The next day, Ms. Ohlinger attended a bond hearing at the Athens County Courthouse without incident. (Def.'s Ex. A, ECF No. 39-1 at PageID #513.) Several days after, on June 24, 2022, Ms. Ohlinger spoke with her mother and daughter. *See* Affidavit of Warden Joshua VanBibber ("VanBibber Aff."), ECF No. 39-1 at ¶¶ 5-6. At one point in her conversation with Ms. Mercer, Ms. Ohlinger remarked she was "doing good," and did not otherwise raise any alarm regarding her health. *See* Deposition of Kelsea Mercer, ECF No. 36 at 57:15-17.

B.  June 25, 2018

i.  <u>7:00 A.M.</u>: **Ms. Ohlinger Collapses**

Around 6:57 A.M. on June 25, 2018, Ms. Ohlinger emerged from her cell in the SEORJ's "A Block" for a routine clothing exchange. (SEORJ Surveillance Video File 1 ("Surveillance Video 1"), Def.'s Ex. 14, ECF No. 40 at 00:24); Deposition of Charity Lowery ("Lowery Dep."), ECF No. 36-2 at 18:1-5. In a matter of seconds, she became disoriented, reached for a nearby lunch

table, briefly sat, and collapsed to the floor. (*Id.*) Several nearby inmates clamored for help, prompting Officers Lowery and Jarvis to respond. (*Id.*) Both officers—neither of which claim to have seen Ms. Ohlinger fall—were told that Ms. Ohlinger had suffered a seizure and "hit her head." Lowery Dep. at 18:25; Deposition of Amista Jarvis ("Jarvis Dep."), ECF No. 36-6 at 15:1-7, 16:13-16.

As the officers approached, Ms. Ohlinger was still "kind of shaking." Lowery Dep. at 19:17-20. To stabilize her, Officer Lowery placed another inmate's sweatshirt under her neck;[1] Officer Jarvis, meanwhile, sought medical attention. Lowery Dep. at 19:17-20; Jarvis Dep. at 20:4-6. Soon after, Ms. Ohlinger regained consciousness and sat upright. (Surveillance Video 1 at 03:45.) Minutes later, at roughly 7:02 A.M., Nurse Gray arrived. (*Id.* at 06:00.) At that point, several bystanders and at least one officer (Officer Lowery) relayed to him what had occurred. Lowery Dep. at 20:20-22; Deposition of James Gray, II ("Gray Dep."), ECF No. 36-4 at 38:20-25, 61:6-8. Ms. Ohlinger, for her part, acknowledged that she had "passed out." Gray Dep. at 38:20-25, 61:6-8.

Over the next two minutes, Nurse Gray assessed Ms. Ohlinger's blood oxygen level, vital signs, pupil dilation, and cognitive motor skills. (Surveillance Video 1 at 06:15–08:00); Gray Dep. at 30:15-17. He also looked for external signs of head trauma (*i.e.*, a contusion). (Surveillance Video 1 at 06:44–07:00); Gray Dep. at 41:20-42:3. Finding nothing of immediate concern, he instructed Officers Jarvis and Lowery to escort Ms. Ohlinger back to her cell to rest. Gray Dep. at 33:1-2. Gingerly, Officers Jarvis and Lowery raised Ms. Ohlinger upright. (Surveillance Video 1

---

[1] Officer Lowery stated as much in her deposition. Lowery Dep. at 19:25-20:3. The surveillance video provided to this Court neither confirms nor refutes this assertion, as a table obstructs the camera's view of what assistance, specifically, Officer Lowery offered. In any event, Ms. Mercer offers no factual rebuttal to Ms. Lowery's testimony.

at 8:10.) Nurse Gray looked on as Officer Jarvis escorted Ms. Ohlinger by the arm to her cot. (*Id.* at 8:17.)

### ii.     **7:15 A.M.:** Ms. Ohlinger Suffers Another Seizure and Urinates Herself

Minutes after she reached her cell, Ms. Ohlinger suffered another seizure, urinating herself in the process. (*See id.* at 8:30–19:41.) Again, Officers Lowery and Jarvis responded. (*Id.* at 20:08.) After helping her wash off and change clothes, Officer Jarvis left the facility, while Officer Lowery—then on "rover" duty[2]— took Ms. Ohlinger to Nurse Gray's office. Jarvis Dep. at 15:17-20; Lowery Dep. at 22:17-18; 23:17-19.

Over the next twenty-odd minutes, Nurse Gray assessed Ms. Ohlinger's vitals and cognitive functions once more. (Pl.'s Ex. 3, ECF No. 36-5.) At some point during, Ms. Ohlinger remarked that she had a headache "related to . . . hitting [her] head on [a] bench previously." (*Id.*) She also denied having a history of seizures. (*Id.*) At the same time, Ms. Ohlinger noted that "this ha[d] happened [in the] last jail she was in," and that, there, she was ultimately diagnosed with dehydration. (*Id.*)

On the whole, Nurse Gray found Ms. Ohlinger to be "alert and oriented," "without deficit," and "[s]table without . . . signs or symptoms[] of acute distress." (*Id.*) Out of precaution, he tested her for a urinary tract infection using a "chemstrip dip." Gray Dep. at 34:8-35:1. This revealed a trace of glucose in Ms. Ohlinger's urine, prompting Nurse Gray to examine Ms. Ohlinger's blood sugar with a glucometer. *Id.* at 34:18-20. Ultimately, he determined "a complete metabolic panel" was needed.[3] (Pl.'s Ex. 3, ECF No. 36-5); Gray Dep. at 34:18-20; 35:20. This, however, required

---

[2] Such entailed Officer Lowery to, among other things, "change out inmates . . . feed them . . . do hourly walk-throughs to check on them," and conduct "clothing exchanges." Lowery Dep. at 8:21-23.

[3] Nurse Gray summarized his consultation with Ms. Ohlinger accordingly:

> 0715- Inmate [Ohlinger] into med room with report of seizure-like activity. Inmates report seizure in block. Inmate A/O (alert and oriented) x 3 spheres s/p (status post) seizure-like activity. Inmate

him to "order" an "outside laboratory" to come draw Ms. Ohlinger's blood. *Id.* at 35:16-18. To await their arrival, he sent Ms. Ohlinger back to her cell. *Id.* at 34:18-20; 35:20.

### iii. <u>9:12 A.M.</u>: Ms. Ohlinger Is Found Unconscious and Later Passes Away

Around 7:38 A.M., Ms. Ohlinger, with Officer Lowery's assistance, reached her cell cot. (Surveillance Video 1 at 42:30.) She remained there for over an hour, occasionally tossing and turning. Around 8:39 A.M., Officer Lowery walked through "A Block" and briefly peered into—but did not enter—Ms. Ohlinger's cell. (Surveillance Video File 2 at 34:00.)

At approximately 9:12 A.M., another inmate found Ms. Ohlinger lying on her back with a foamed mouth, unresponsive and without a pulse. (Surveillance Video File 2 at 1:07:15); Lowery Dep. at 28:13-14. Two minutes later, Officer Lowery reached the scene, with Nurse Gray following in tow. (Surveillance Video File 2 at 1:09:30–1:10:22.) At that point, an emergency medical squad was called. In the roughly eight-minute span before the squad's arrival, Nurse Gray administered "chest compressions and rescue breathing" on Ms. Ohlinger, all to no avail. (*Id.* at 1:10:22–1:13:43; Surveillance Video File 3 at 0:00–4:42.)

At 9:28 A.M., Ms. Ohlinger was transported to a local hospital, where she would be life-flighted to a Columbus, Ohio-area trauma center. (Surveillance Video File 3 at 8:24); Expert Report of William B. Gormley ("Gormley Report), M.D., M.P.H., MBA, ECF No. 41-2. There,

---

denies hx (history) of seizures and denies medications. B/P (blood pressure) 120/70, pulse 92, Spo2 99% ora (on room air), Temp 97.4. PEERLS (pupils equal and reactive to light stimuli. C/O (complained of) HA (headache) r/t (related to) report of hitting head on bench previously. Urine dark amber colored et (and) clear. U/A (urinalysis) strip + ++ for blood, inmate is menstruating currently. All other components WNL (within normal limits). States this has happened last jail she was in and they sent her to ED (emergency department). Dx (diagnosis) was dehydration. BS (blood glucose) 186. No Hx (history) of diabetes. N/O (new order) CMP (complete metabolic panel), CBC (complete blood count) et Al C. Inmate A/O (alert and oriented) without deficit. Stable without s /sx (signs or symptoms) of acute distress. Returned to A block.

(Pl.'s Ex. 3, ECF No. 36-5.)

5

CT imaging revealed that she had suffered a "subarachnoid hemorrhage." Gormley Report, ECF No. 41-2 at PageID #1044; (Coroner's Report, ECF No. 39-1 at PageID #521.) Efforts to remedy the bleed were unsuccessful, and the next morning, Ms. Ohlinger passed. Gormley Report, ECF No. 41-2 at PageID #1044.

## II.

On June 25, 2020, Ms. Mercer filed a three-count complaint against five different Ohio counties (the "County Defendants"),[4] the SEORJ Defendants, Officer Cody Gilbraith, and SEORJ Warden Joshua VanBibber. (ECF No. 1.) In the ensuing months, she (1) voluntarily dismissed the County Defendants and (2) filed a three-count Amended Complaint aimed solely at the SEORJ Defendants, Officer Gilbraith, and Warden VanBibber (the "First Amended Complaint" or "FAC"). (ECF Nos. 19, 23.) Counts I and II—both of which are brought under 42 U.S.C. § 1983—assert, in essence, that those individuals violated Ms. Ohlinger's "Eighth and/or Fourteenth Amendment constitutional rights" by providing her "inadequate medical care" in the face of a clear health crisis. (FAC, ECF No. 23 at ¶¶ 43-54.) Count III alleges a violation of Ohio's wrongful death statute on the same basis. (*Id* at ¶¶ 55-56.)

In September 2021, all five remaining defendants moved for summary judgment. (Def.'s Mot., ECF No. 39.) Ms. Mercer responded, (ECF No. 42), then moved without opposition to drop Officer Gilbraith and Warden VanBibber from this dispute. (ECF No. 43.) The latter motion, which is **GRANTED**, leaves only her claims against the SEORJ Defendants to adjudicate.

## III.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[4] These included: Athens County, Ohio; Hocking County, Ohio; Morgan County, Ohio; Perry County, Ohio; and Vinton County, Ohio.

The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). To prevail in that endeavor, the non-movant must clearly identify "with enough specificity" the parts of the record that enable the court to "readily identify the facts upon which the non-moving party relies." *Siemer v. Comet N. Am.*, 467 F. Supp. 2d 781, 785 (S.D. Ohio 2006) (quoting *Guarino v. Brookfield Twp. Tr.*, 980 F.2d 399, 405 (6th Cir. 1992). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### IV.

The SEORJ Defendants predicate their summary judgment motion on federal qualified immunity, which "shields federal and state officials from money damages unless a plaintiff" sufficiently shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). In their view, no "reasonable jury" could find they violated Ms. Ohlinger's "Eighth and/or Fourteenth Amendment constitutional rights" on the evidence at bar. And even if Ms. Mercer *has* sufficiently raised a "genuine dispute" as to whether they violated a constitutional right of Ms. Ohlinger's, the SEORJ Defendants contend that right was far from "clearly established." Either way, they assert, summary judgment is warranted.

The Court need not reach the second prong of the SEORJ Defendants' argument, as it agrees with the first. Simply put, Ms. Mercer has not demonstrated that any of the SEORJ Defendants possessed the "sufficiently culpable mental state" this circuit requires for inadequate-medical-care claims. *Trozzi v. Lake Cty.*, 29 F.4th 745, 758 (6th Cir. 2022). Accordingly, and as explained below, her case cannot proceed.

**A.  Count I: Deliberate Indifference – Inadequate Medical Care**

Count I of Ms. Mercer's First Amended Complaint accuses the SEORJ Defendants of treating Ms. Ohlinger's extreme health issues with "deliberate indifference," thereby depriving her of "proper," constitutionally owed "medical care." Specifically, Ms. Mercer posits that "Defendants Gray, Lowery, [and] Jarvis . . . knew there was a substantial risk to [Ms. Ohlinger's] health if" her seizure activity went untreated; that "[a]ny diligent nurse and/or jail officer would have . . . promptly" summoned a doctor, paramedics, or a supervisor in the face of that information; and that "[i]t was objectively unreasonable" for those individuals to "ignore" such an obligation.

In its totality, Ms. Mercer concludes, this behavior violated Ms. Ohlinger's constitutional right to adequate medical care. The United States Court of Appeals for the Sixth Circuit's recent line of decisions addressing this particular issue, however, compels this Court to disagree.

### i. The State of the "Deliberate Indifference" Standard

As Ms. Mercer alludes, all incarcerated individuals have a constitutional guarantee to adequate medical care. *See, e.g.*, *Trozzi*, 29 F.4th at 751. For convicted prisoners, this right flows from the "Eighth Amendment's prohibition on cruel and unusual punishment." *Id.* Not so, however, for pretrial detainees like Ms. Ohlinger, whose protection instead arises from the Fourteenth Amendment's Due Process Clause. *Id.* at 755; *Westmoreland v. Butler Cty.*, 92 F.4th 721, 727 (6th Cir. 2021).

"[H]istorically," this distinction has been without much difference. *See Westmoreland*, 29 F.4th at 727 (citation omitted). That is, in this circuit, courts have traditionally "analyzed Fourteenth Amendment pretrial detainee claims and Eight Amendment prisoner claims 'under the same rubric.'" *Westmoreland*, 29 F.4th at 727 (citation omitted). Generally, this entailed a two-part "objective" and "subjective" inquiry—one which required the plaintiff to show (1) that his or her injury was "objectively" serious, and (2) that a prison or jail "official kn[ew] of and disregard[ed]" the "excessive" medical risk that injury posed. *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994).

*Brawner v. Scott Cty.*, however, slightly (albeit definitively) changed the equation. 14 F.4th 585 (6th Cir. 2021). There, the Sixth Circuit, in light of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "modified" the subjective component of the deliberate-indifference-to-medical-needs test for pretrial detainees, acknowledging that an official's "reckless" (rather than "knowing") disregard of a detainee's "serious" medical risk was enough to run astray of the Fourteenth

9

Amendment. *Greene v. Crawford Cty.*, 22 F. 4th 593, 606 (6th Cir. 2022) (citing *Brawner*, 14 F.4th at 597). Months later, in *Trozzi*, the Sixth Circuit clarified the import of *Brawner*'s "modified" standard. 29 F. 4th at 757. "Reading *Farmer*, *Kingsley*, *Brawner* and *Greene* together," the court surmised that "a plaintiff must satisfy three elements" to prevail on any "inadequate-medical-care claim [arising] under the Fourteenth Amendment"—specifically, by showing that:

> (1) [he or she] had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official *knew* that his failure to respond would pose a serious risk to the pretrial detainee and *ignored* that risk.

*Id.* at 757-58 (emphasis added).

As articulated, this third element, the *Trozzi* court reasoned, remains "faithful[]" to *Kingsley,* a decision which itself acknowledged that a jail official's inaction must be "purposeful or knowing"—or, at the very least, criminally reckless. *Id.* at 758 (citing *Kingsley*, 576 U.S. at 396). By extension, the *Trozzi* court noted, evidence of a jail official's mere "inaction in the face of an objectively serious medical need [is] insufficient to demonstrate deliberate indifference in violation of the Fourteenth Amendment." *Id.* at 757. Likewise, it added, an "official who lacks an awareness of the risks of her inaction"—say, for example, "because . . . another official takes responsibility for medical care, a medical professional reasonably advised the official to not act, the official lacked authority to act, etc."—"cannot have violated the detainee's constitutional rights." *Id.* at 758 (citation omitted).

With these principles in mind, the Court turns to Ms. Mercer's deliberate indifference claims.

### ii. Analysis

The SEORJ Defendants do not dispute that Ms. Ohlinger suffered an "objectively serious medical need" on the day she died. Nor could they realistically do so, as there is no universe where

10

a lethal brain hemorrhage—known or not—constitutes a less-than-serious injury. Instead, the SEORJ Defendants cabin their arguments to the second and third "elements" of the tri-part test discussed above. The Court addresses their contentions in turn.

      a. *Nurse Gray*

The SEORJ Defendants raise two arguments with respect to Nurse Gray. *First*, they contend, no "reasonable person in Nurse Gray's position" would have "glean[ed] from the scant and conflicting information" at his disposal that Ms. Ohlinger "was having seizures—or that she was in the midst of a medical emergency." (Def.'s Mot., ECF No. 39 at PageID #486.) *Second*—and regardless of whether Nurse Gray "reasonably" should have understood that Ms. Ohlinger faced an "excessive risk of harm"—they assert there is simply "no evidence" to support the conclusion "that Nurse Gray *disregarded* Ms. Ohlinger's condition," or that he "was *reckless* with respect to Ms. Ohlinger's care." (*Id.* at PageID #486-87) (emphasis in original).

The Court need not delve into the SEORJ Defendants' first argument; the second is enough. That is, even when construed in Ms. Mercer's favor, the record fails to show that Nurse Gray "knowingly" or "recklessly" disregarded Ms. Ohlinger's medical condition, or that he "knew" she risked "serious" injury if he refrained from calling an ambulance or a doctor after their two consultations. *See Trozzi*, 29 F.4th at 758. At most, it demonstrates that Nurse Gray made *some* effort to trace the root cause of Ms. Ohlinger's "seizure-like activity"—*i.e.*, by examining her vital signs and cognitive motor skills twice, testing her for a urinary tract infection, and attempting to obtain additional bloodwork—and ultimately misread the situation as one that required more bloodwork, rather than immediate intervention from a physician. And in this jurisdiction, such an oversight—while undeniably tragic—is not tantamount to "deliberate indifference." *See id.* at 757-58 (noting, among other things, that "simple inaction in the face of an objectively serious medical

11

need [is] insufficient to demonstrate deliberate indifference in violation of the Fourteenth Amendment," and that, "in practice, that may mean that a prison official who lacks an awareness of the risks of her inaction . . . cannot have violated the detainee's constitutional rights"); *Briggs v. Oakland Cty.*, 213 Fed. App'x 378, 385 (6th Cir. 2007) (finding that a jail nurse who (1) "perceived a lesser risk of serious harm" to the plaintiff's health and (2) "acted under that belief by giving [the plaintiff] certain medication and placing him under observation" could not be reasonably construed to have acted with "deliberate indifference"); *see also McCain v. St. Clair Cty.*, 750 Fed. App'x 399, 404 (6th Cir. 2018) (finding that the plaintiff, who contended a jail nurse "acted with deliberate indifference when she failed to secure his seizure medication before his first seizure," had, "at best," shown that the nurse "*should have* known" of the risk of failing to secure that medication, not that she was deliberately indifferent to his ailment); *Briggs*, *supra* at 385 (noting that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

  Ms. Mercer, seeking to stave off this conclusion, points to (1) the nature of Ms. Ohlinger's "serious medical need," (2) the SEORJ's own "nursing guidelines"—which required an inmate to be seen by a physician in the event they suffered their first-ever seizure—and (3) a standalone opinion from a medical expert that Nurse Gray's actions were "inexcusable" and "indicative of being deliberately indifferent to Jennifer's serious medical needs." (Pl.'s Resp., ECF No. 42 at PageID #1054-55); *see also* Gormley Report, ECF No. 41-2 at PageID #1045. The latter opinion—a bald-faced legal conclusion—does not materially support her claim. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994) (requiring the exclusion of expert testimony that a police department was "deliberately indifferent" because such an opinion "invaded the province of the court"). Nor does the rest of the rest of the evidence Ms. Mercer relies upon. *See Meier v. Cty. Of*

12

*Presque Isle*, 376 Fed. App'x 524, 529 (6th Cir. 2010) (finding that a police official's violation of a "departmental policy requiring that a subject with a BAC of .30 or above be transported to a medical facility" did not constitute a "per se constitutional violation," even if he was "aware of the policy" during the relevant time period).

Again, the record reflects that Nurse Gray, after two separate examinations, failed to recognize that Ms. Ohlinger was in any "acute distress." (*See* Pl.'s Ex. 3, ECF No. 36-5.) All of the evidence Ms. Mercer cites (outside of her expert witness's conclusory opinion) speaks to the *reasonableness* of this mistake—*i.e.*, the second prong of the tri-part inquiry noted above. *See Trozzi*, 29 F.4th at 757-58. It does not meaningfully show that Nurse Gray "actually understood" (and ultimately disregarded) the "consequences" of failing to rush Ms. Ohlinger to a hospital. *Id.* at 758. To that extent, her deliberate indifference claim against him cannot proceed.

b. *Officers Lowery and Jarvis*

Ms. Mercer's deliberate indifference claims against Officers Lowery and Jarvis fail for effectively the same reason. All told, the record reflects that both officers (1) quickly responded to Ms. Ohlinger as soon as her first and second seizures were reported, (2) notified a present medical authority (Nurse Gray) after each reported incident, and, in Officer Lowery's case, (3) escorted Ms. Ohlinger to-and-from Nurse Gray's medical office. It likewise demonstrates that both officers "deferred" to Nurse Gray's decisions to place Ms. Ohlinger back in her cell. *See Greene*, 22 F. 4th at 608. And right or wrong, that deference—in tandem with each officer's other actions—places their conduct outside the realm of "deliberate indifference." *See id.* ("[W]e have recognized that a 'non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions," even if, unbeknownst

13

to that officer, that professional "was not sufficiently trained to diagnose the inmate") (quoting *McGaw v. Sevier Cty.*, 715 Fed. App'x 495, 498 (6th Cir. 2017).

  **B. Count II:** *Monell* **Claim**

  Ms. Mercer's second claim, in the main, accuses Warden VanBibber of (1) "fail[ing] to adequately train and supervise [Nurse] Gray, other members of the medical staff, and [SEORJ] corrections officers in the assessment, monitoring, and treatment of inmates in serious medical need," and (2) "implement[ing] and/or enforce[ing] . . . rules, regulations, customs, policies, and procedures . . . regarding the treatment and management of persons requiring specialty medical care [that] were inadequate, unreasonable[,] . . . deliberately indifferent," and "the moving force behind the constitutional deprivations suffered by Jennifer Ohlinger." (ECF No. 23 at ¶¶ 52, 54.) At this stage, however, Ms. Mercer has abandoned her suit against Warden VanBibber. And even construing Count II as being brought the SEORJ itself, there is, as the SEORJ Defendants note, "no evidence" any SEORJ-specific policy was the "moving force" behind any apparent constitutional violation.[5] Accordingly, this claim, too, fails as a matter of law.

  **C. Count III: Wrongful Death**

  Ms. Mercer, as noted, brings her third and final claim against the SEORJ Defendants under Ohio's wrongful death statute, O.R.C. § 2125.02. (ECF No. 23 at ¶¶ 55-56.) Here again, the SEORJ Defendants assert they are entitled to immunity—specifically under O.R.C. §§ 2744.03(A)(6) (in their individual capacities) and 2744.02(A) (in their official capacities). The Court, for essentially the same reasons discussed above, agrees.

---

[5] Ms. Mercer does not even attempt to rebut this point in her briefing. Thus, she has abandoned any counterargument on the issue.

### i. Individual Capacity Claims

O.R.C. § 2744.03(A) immunizes the employees of Ohio's "political subdivision[s]" from all civil actions brought to "recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function" unless, among other things, "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b). Ms. Mercer contends that this "recklessness" exception applies—and, thus, that the SEORJ Defendants may be deemed liable for her mother's "wrongful death[.]" (Pl.'s Resp., ECF No. 42 at PageID #1056) (asserting that the record, construed in her favor, "and for the same reasons discuss[ed]" in relation to her "deliberate indifference" claims, reasonably shows that the "[SEORJ] Defendants acted in a reckless manner"). The SEORJ Defendants beg to differ. As they note, the standard for "recklessness" under O.R.C. § 2744.03(A)(6) essentially mirrors this circuit's "deliberate indifference" standard. (Def.'s Mot., ECF No. 39 at PageID #499.) Accordingly, because Ms. Mercer has failed to show they were "deliberately indifferent" to Ms. Ohlinger's medical needs, the SEORJ Defendants assert they are "entitled to immunity" under Ohio law.

For all intents and purposes, the SEORJ Defendants are correct. As the Sixth Circuit recognizes, "reckless" conduct under O.R.C. § 2744(A)(6)(b) is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Argabrite v. Neer*, 149 Ohio St.3d 349, 75 N.E.3d 161, 164 (2016)). And where, as here, "federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact," courts "may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Id.* (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)).

Ms. Mercer, for reasons already discussed, has not sufficiently illustrated that the SEORJ Defendants were "deliberately indifferent" to Ms. Ohlinger's medical needs—meaning, in turn, that they are entitled to federal qualified immunity. By extension, then, state-law immunity under O.R.C. § 2744.03(A)(6) attaches. *See id.* No reasonable mind could find otherwise.

### ii. Official Capacity Claims

To the extent Ms. Mercer brings her wrongful death claims against the SEORJ Defendants in their "official" capacities—which is tantamount to bringing those same claims against the SEORJ itself—the SEORJ Defendants contend they are presumptively entitled to immunity under O.R.C. § 2744.02(A), which protects Ohio's "political subdivisions." Ms. Mercer does not contest this argument. (Pl.'s Resp., ECF No. 42 at PageID #1055-56) (addressing only O.R.C. § 2744.03(A)(6)). Nor, for the reasons noted by the SEORJ Defendants, would she be likely to prevail even if she did mount a rebuttal. In any event, the SEORJ Defendants carry the day on this point.

### V.

The circumstances underlying Ms. Ohlinger's death were and are undeniably tragic. And perhaps that is due to the actions of at least some of the defendants in this case, who could have (or even should have) reacted with more haste to her condition. But that is a matter of hindsight. And as the Sixth Circuit has made clear, hindsight as to how a jail official *should* have approached a detainee's apparent medical needs carries little weight in the "deliberate indifference" analysis. *See Trozzi*, 29 F.4th at 756. Nor does evidence of basic medical negligence. *See id.* at 757-58; *McCain*, 750 Fed. App'x at 405. More must be shown—specifically, that the defendant possessed a "culpable mental state" of "deliberate indifference." *Trozzi*, 29 F.4th at 758. Here, even on a favorably construed record, Ms. Mercer has not made such a showing.

16

For that reason, the Court **GRANTS** the SEORJ Defendants' Motion for Summary Judgment (ECF No. 39), as well as Ms. Mercer's Motion to Drop Defendants Cody Gilbraith and Joshua VanBibber (ECF No. 43). Ms. Mercer's claims are **DISMISSED**, and this case shall be closed on the docket of this Court.

  **IT IS SO ORDERED.**

| | |
|---|---|
| **<u>9/22/2022</u>** | <u>s/Edmund A. Sargus, Jr.</u> |
| **DATE** | **EDMUND A. SARGUS, JR.** |
| | **UNITED STATES DISTRICT JUDGE** |